Whaley, Chief Justice,
delivered the opinion of the court:
The plaintiff entered into a contract with the defendant December 31,1935, whereby it was to'construct the Bull Lake Dam, Riverton Project, State of Wyoming, under the supervision of the Bureau of Reclamation.
It was an undertaking involving $653,397.50. The dam was earth-filled with appurtenant concrete structures. The earth embankment was raised by the plaintiff’s subcontractor, Matt S. Ross, while plaintiff with its own forces did the concrete work. Materials such as sheet steel-piling, cement, steel, reinforcing steel, were furnished by the United States. The plaintiff’s claim is wholly one for damages due to alleged unreasonable delay both to itself and its subcontractor Ross, chargeable to the defendant.
The contract contained the usual provision that work was to start within a certain period after receipt of notice to pro *144 ceed. The maximum time for completion was 700 days. The notice to proceed was received February 24,1936, in the midst of winter, thus establishing January 24,1938, as the date for completion, also in the midst of winter.
The plaintiff anticipated the initial contract date by moving into the work about the first of January, 1936, establishing a camp, doing preliminary work.
In the climate afforded in winter by the region where the dam was to be located, construction work could not start before spring.
The plaintiff transmitted its progress schedule to the defendant March 14,1936. Prior thereto the defendant February 14,1936, had changed the method of constructing the gate chamber of the outlet conduit from two-stage to one-stage construction.
The outlet conduit was located beneath the embankment. At the conduit’s upstream intake end there was a trash rack and at its lower end a stilling basin. Flow of water through the conduit was controlled by gates, and the chamber housing them was that referred to in the change order of February 14, 1936. The conduit was of concrete construction. Some 200 feet from the outlet conduit was located, across the dam and near its center a concrete spillway and stilling basin. The spillway was provided with taintor gates and was spanned by a bridge in the dam.
The plaintiff scheduled commencement of work on this outlet conduit April 1,1936, concrete to be poured beginning April 15, 1936. The construction program was a matter of cooperation between the plaintiff and defendant’s resident engineer.
Upon receipt of the plaintiff’s schedule of proposed progress in the middle of March, 1936, defendant’s officers made necessary changes in drawings and prepared detailed plans of the conduit, to suit them to plaintiff’s schedule.
The conduit plans were necessary to enable the plaintiff to proceed, and they were not delivered to the plaintiff until April 13,1936. The plaintiff had planned to proceed on that part of the project the first of April, and this meant a two-weeks’ delay.
*145 The question is presented whether the defendant took an unreasonable length of time to perfect the plan of the conduit,, after receipt in the middle of March of plaintiff’s schedule of' progress, and present that plan to the plaintiff. The time so-spent was one month. We cannot say, or infer, from the-circumstances recited in the Court’s findings, that the defendant was guilty of an unreasonable delay. If we understand plaintiff’s brief correctly, the plaintiff concedes the well-established rule that in cases of this sort the defendant is entitled to a reasonable time to perfect plans for changes without responding in damages.
Upon receipt of the revised plans April 13,1936, the plaintiff proceeded with its form work for the conduit.
But the excavation for the conduit awaited the result of test pit data, which the defendant required of the plaintiff under an order for extra work. The tests indicated a satisfactory condition, no delay in making the tests was involved, stripping the area commenced April 22,1936', and excavation for the conduit was begun May 21,1936.
There then developed a condition upon the site itself that delayed the work. On May 22, 1936, one day after starting to excavate for the conduit, quicksand or something equivalent to quicksand was uncovered. This of course was unsatisfactory material upon which to lay the conduit. Defendant at once put a stop to the excavation to determine upon means to correct the situation. In a week’s time, May 29,1936, the defendant determined upon the corrective treatment and gave notice thereof to the plaintiff. The affected area was surrounded by piling, the faulty material removed and in its place selected material was deposited and compacted, using a cellular substructure for that purpose. This corrective treatment was covered by revised plans and the defendant had to furnish the extra sheet steel-piling. The work was done in something less than 120 days, but after it was done the change order was issued, September-23, 1936,. ordering the change, extending the contract time for performance by 120 days, adjusting the contract price on account of the change, and the change order was accepted and signed by the plaintiff December 1,1936.
*146 The notice of May 29, 1986, however, was not a notice to proceed, for resumption of work could not take place before the corrective plans were drafted. The plans so drafted had to be revised, and the revised plans for proceeding with the work were not in the plaintiff’s hands until June 24, 1936. But that was not all that was required of the defendant, for the defendant, when the changes had been decided upon, had to advertise for bids for, purchase, and deliver to the plaintiff the necessary extra steel. Acquirement of the steel took approximately 30 days and plaintiff was unable to pour concrete for the conduit until July 25,1936. It had planned to begin pouring April 15,1936.
Here again we can find no lack of diligence upon the defendant’s part.
The price of a change order, like the price of the original contract, presumptively embraces cost, inclusive of overhead, is not without prospective profit, and the change order, like the original contract, gives a time, certain for performance. The change we have here, attributable to unforeseeable conditions, is authorized by the contract to be made, and it is too well-settled to deserve citations, that damages are not recoverable for delays occasioned solely by authorized changes. Dilatory action in considering a change is no proper part of the procedure authorized by the contract in making a change, but here we can find no neglect by the defendant properly to expedite matters.
There are damages claimed by the plaintiff for other delays. The plaintiff began its operations on the conduit July 25,1936. Honeycombing developed in the concrete as mixed under the defendant’s formula. The defendant revised the formula and the mix was then satisfactory. The fact that in the first instance the plaintiff used one vibrator and in the •second, two, had a minor influence, if any, in the result. The main trouble, under the circumstances, was the formula. There was no occasion for changing the formula if no fault lay therein. By reason of all this the concrete work was delayed, but the effect on ultimate completion of the job the parties to the cause do not undertake to demonstrate.
The plaintiff claims damages by reason of expense incurred in heating concrete during freezing weather, the work having *147 been thrown into winter months due to the delay arising through the instability of foundations for the conduit. As heretofore explained, this was not defendant’s fault, and the item is not recoverable.
The plaintiff had advised the defendant that it intended to pour concrete in the outlet works stilling basin about October 1, 1936. The plaintiff changed this program and on or about September 10, 1936, advised the defendant that it expected to pour about September 12, 1936. This was short notice, but the defendant expedited its cutting lists for the reinforcing steel and furnished them to the plaintiff promptly. There was some delay, if September 12,1936, was to be the date to start pouring, but this delay was not defendant’s fault.
There is some contention that plaintiff could have expedited the work by using more than two sets of forms in pouring concrete for the conduit. A matter of that sort is one of sound judgment, taking into consideration economy, expedition, organization. There is found no proof that the plaintiff acted unreasonably in restricting the set of forms to two in number.
Finding No. 22 gives details concerning the work during the winter of 1936-1937. Plaintiff closed down its operations, using a small detail of men to guard the premises, check things over, overhaul equipment, plan for the coming of milder weather. Under the circumstances this is apparently all that plaintiff could do, and neither party is to be charged with any fault over the immediate cause of the delay. The project was located in country where low temperature is experienced in winter.
Before the parties were freed from winter restrictions the plaintiff furnished the defendant with its plans for 1937, indicating completion of the entire project in September of that year.
The 1937 program included construction of the spillway. Here were encountered quicksand conditions, as in the case of the outlet conduit, but not to such an extent. The cellular method of stabilizing the foundation was adopted. The investigation which resulted in laying bare quicksand conditions in the outlet conduit area, indicated that such conditions might extend to the spillway.
*148 Final revised plans for tbe affected area of the spillway were received June 16, 1937. The plaintiff began driving steel sheet-piling for the cells (there were only two of them, as compared with 12 or 14 for the conduit) but within five or six days ran out of piling. The requisite additional supply arrived June 25, 1937, and the pile driving was completed about June 26,1937.
After the piles were driven the next step was to excavate from within their boundary. Some of the piling caved in due to external pressure. Plaintiff attributes this to a softened ground condition due to rains while plaintiff was wating for additional piling. If the ground was soft when excavation was going on, plaintiff knew it, and it was bound to take proper precautions.
However, the plaintiff did run out of piling, which it was the duty of the defendant to furnish, but, as in other instances, the plaintiff diverted its labor to other parts of the work until the piling arrived, and no substantial delay in final completion of the contract is proved.
But rains did interfere with plaintiff’s excavation for cutoff walls down the length of the spillway. Reinforcing steel, which defendant was to furnish, was not at hand, and rain washed down, caving in the excavations, while the plaintiff was waiting for the steel. The concrete could not be poured without the reinforcing steel. Delay was experienced, but the extent thereof is not shown.
Errors were made by the Government in the matter of cutting and bending steel, but no material increase in cost to the plaintiff, not reimbursed the plaintiff, presents itself.
Finding No. 26 relates to plaintiff’s wholesale method of cutting steel, which defendant says allowed it no reserve for exigencies. The method used by plaintiff was imprudent.
Proof as to delay in installation of radial gates is not complete. The Government failed to furnish a specified aligning device in proper condition and time, and this f ailure delayed completion of the contract, but just to what extent is not shown. The incidence of this delay fell upon construction of the highway bridge. The gates had to be adjusted before proceeding with the bridge, but here the proof also is defec *149 tive, and we do not know whether it affected completion of the contract, or what plaintiff’s extra costs were, if any.
The project included a parapet wall on the upstream side of the crest of the dam, with a handrail alongside the highway. There was to be a curb on the opposite or north side of the highway. Here again there was delay in furnishing the reinforcing steel for the concrete work, but the effect in time on ultimate completion of the contract is not disclosed. Cold weather intervened and the work was resumed and finished in the spring of 1938.
There were short, indefinite periods of delay in connection both with furnishing and with installation of piping. Whether plaintiff was delayed in the ultimate completion of its contract thereby is not disclosed. It appears to be merely a matter that had little or no effect on the work, because of plaintiff’s practice of shifting its force to places where work could be done, a practice which must be considered a matter of course. With a given force of workers this might well result in no appreciable delay.
Winter again interrupted operations. This was anticipated by the parties in a conference in the fall of 1937, as a result of which the defendant issued a stop order dated January 3, 1938, effective until April 15,1938. Being the result of a conference, it was not a forced order, and the seasonal stoppage of work may not be charged to either party,
The remainder of plaintiff’s claim is in behalf of its subcontractor, Matt S. Boss, who did the earthwork, that is, excavating and filling, including the embankment of the dam, which was earth-filled. But this subcontractor’s delay, somewhat less than that of the plaintiff, was due to two things, adverse weather, and quicksand conditions in the foundations. Neither of these conditions was the fault of the Government, and as we have seen, there is no proven lack of diligence upon the part of the Government in meeting those conditions. The quicksand conditions required a change in the work. Appropriate change orders were issued correcting foundation conditions both under the conduit and under the spillway, naming the price, and these orders were accepted by the plaintiff. There was no breach by the defendant in connection with foundation conditions.
*150 On the whole case there is established either no breach of the contract, or where breach might be inferred, no sufficient proof of the extent of any resulting delay or the amount of any additional expense.
Plaintiff is not entitled to recover and its petition is therefore dismissed. It is so ordered.
MaddeN, Judge; Whitaker, Judge; and LittletoN, Judge, concur.
JoNes, Judge, took no part in the decision of this case.